UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUBEN MORALES GONZALEZ, JR., <br><br> Plaintiff, <br><br> v. <br><br> BORLA, et al., <br><br> Defendants. | Case No. 24-cv-01164-EKL <br><br> **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND MOTION FOR EVIDENTIARY HEARING** <br><br> Re: Dkt. Nos. 1, 25 |

In March 2019, after an eleven-day trial in Contra Costa County Superior Court, a jury convicted Petitioner Ruben Morales Gonzalez, Jr. ("Petitioner" or "Gonzalez") of 47 counts of felony child abuse involving his three nieces, including for aggravated sexual assault of a child – oral copulation, aggravated sexual assault of a child – sexual penetration, aggravated sexual assault of a child – rape, and forcible lewd acts upon a child. Ex. 9 at 1-2, ECF No. 14.[1] Petitioner was sentenced to a determinate term of eighteen years, eight months, and a consecutive indeterminate term of 695 years to life. *Id.* at 1. Petitioner subsequently and unsuccessfully pursued direct and habeas review in California state court. *See* Exs. 9-14.

On February 27, 2024, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting five bases for relief: (1) the testimony of his adult daughter was improperly coerced in violation of his due process rights; (2) his daughter's testimony was improperly admitted under California Evidence Code section 1108 as an uncharged act of sexual abuse; (3) the prosecutor improperly lowered the standard of proof in closing arguments; (4) his counsel was ineffective in failing to object to the admission of his daughter's testimony and the

---

[1] All exhibits are filed under ECF No. 14.

prosecutor's closing argument; and (5) his lengthy sentence violates the Eighth Amendment. *See* ECF No. 1 ("Pet."); *see also* ECF No. 24 ("Traverse"). Petitioner separately moved for an evidentiary hearing to develop facts relevant to his ineffective assistance of counsel claim. ECF No. 25 ("Mot."). Respondent filed an answer to the petition and opposition to the motion for an evidentiary hearing. ECF No. 13 ("Answer"); ECF No. 26 ("Opp.").

The habeas petition and the motion for an evidentiary hearing are each fully briefed and before the Court. For the reasons discussed below, the petition for writ of habeas corpus is DENIED and the motion for an evidentiary hearing is DENIED.

## I.    BACKGROUND

The following facts, presumed to be correct under 28 U.S.C. § 2254(e)(1), are excerpted from the California Court of Appeal's opinion addressing Petitioner's direct appeal. *See* Ex. 9. The California Court of Appeal found as follows:

### *A. Jane Doe 1[, Jane Doe 2, and Jane Doe 3]*

Jane Doe 1 was born in January 1998. At the time of trial, when not at college, she stayed at her family residence on Hemleb Court with her father; her sister, Jane Doe 2; two aunts, A.M. and Al.M. (her mother's sisters); and several cousins, including Jane Doe 3, whose mother is Al.M. Gonzalez is her uncle, A.M.'s long-term partner. Growing up, Gonzalez was like a second father to her, and she spent a lot of time with him while her father was working. Gonzalez did not originally live with her. She was about four or five when he began to touch her in a sexual way.

. . .

[Jane Doe 1 testified that between the ages of four and seventeen, Petitioner touched her chest, legs, and vagina; put his mouth on her vagina; put his penis on her vagina; made her touch his penis; made her put her mouth on his penis and forced her to swallow when he ejaculated; and put his penis in her vagina. She testified that Petitioner would sometimes blindfold her or tell her to close her eyes, before putting his penis in her mouth, and he would lure her with the promise of candy. Jane Doe 2 and Jane Doe 3 testified that Petitioner did the same things to them. Each of the Jane Does also testified that they had witnessed Petitioner take the other Jane Does into private rooms.]

[For example, Jane Doe 1 testified that ] [o]n New Year's Eve in 2007 when she was nine, . . . Gonzalez approached [her] and told her that her father needed her in the bedroom. As she was walking towards the bedroom, Gonzalez grabbed her and pulled her into the bathroom. Gonzalez started touching her, had his hand in his pants, and was

United States District Court
Northern District of California

starting to undress her when Jane Doe 4 knocked on the door. Gonzalez told Jane Doe 1 to get in the shower and not move or say anything. He pretended to use the bathroom and walked out. Jane Doe 4 found her and asked what she was doing. She began to cry and ran into the bedroom, where Gonzalez found her and cautioned her not to "say anything to anybody." However, later that evening she did tell A.M. that Gonzalez had been touching her and doing inappropriate things with her. A.M. stated she would talk to Gonzalez and "fix things," but "nothing really changed."

. . .

The incidents Jane Doe 1 described were "just a very small portion" of the totality of what occurred over the years. After the final incident, while Jane Doe 1 was still 17, she heard Gonzalez and A.M. fighting downstairs. Gonzalez came to find Jane Doe 1 and told her that she had to stop "saying things" to her aunt and that "he was not going to go to jail for something as small as what he was doing, that he'd have to kill somebody for him to go to jail." Gonzalez threatened to get Jane Doe 1's father deported and kill her mother, and "take [her] aunt down with him," if she said anything. Jane Doe 1 had seen Gonzalez be physically and verbally abusive with A.M. She disclosed what had been happening to an adviser at college, and, after starting therapy in the spring of her freshman year, she reported the abuse to child welfare.

. . .

### D. Jane Doe 4

Jane Doe 4 was born in March 1979 and is Gonzalez's daughter. She did not live with Gonzalez, and their relationship was "off and on" as her parents were not together. When asked if Gonzalez had ever touched her inappropriately, Jane Doe 4 initially testified that she "was not sure." However, she acknowledged she had voluntarily made a statement to the police in April 2017. In that statement, she disclosed that – when she was between five and eight years old – Gonzalez had touched her over her clothing in her vaginal area and on her chest five or six times. Jane Doe 4 never told anyone about Gonzalez's inappropriate behavior.

On New Year's Eve in 2007, various family members were hanging out together when Jane Doe 4 observed Gonzalez lean down and whisper something in Jane Doe 1's ear. "[R]ed flags went off" in Jane Doe 4's mind, so, after a while, she went to see where Jane Doe 1 had gone. Jane Doe 4 knocked on the bathroom door and, after Gonzalez exited, she discovered Jane Doe 1 standing in the shower behind the shower curtain. According to Jane Doe 1, Gonzalez told her to stay there because they were going to play hide-and-go-seek. Jane Doe 4 told A.M. what she had observed and asked her to speak with Jane Doe 1 to "make sure everything [was] good." A.M. subsequently took Jane Doe 1 into a closed bedroom. Jane Doe 4 also called Jane Doe 1's father and suggested he talk to her to make sure she was okay. She could not recall whether she had told Jane Doe 1's father that she had been molested by Gonzalez in the past.

United States District Court
Northern District of California

> On cross-examination, Jane Doe 4 testified that she had been seeing a therapist for about a year because "a lot of things" from her past were coming to the surface. This process made her less confident that the described abuse actually happened. Jane Doe 4 spent time with the other three Jane Does over the years and none of them acted afraid of Gonzalez. She had never observed anything similar to what happened in 2007 on New Year's Eve. If she had suspected that Gonzalez was molesting the other Jane Does, Jane Doe 4 would not have hesitated to call the police. After Gonzalez was arrested, Jane Doe 4 told Jane Doe 1 that something had happened to her when she was younger but gave no specifics. Jane Doe 1 told Jane Doe 4 "she was going to do whatever she could do to see [Gonzalez] go away for a long time."

Ex. 9 at 2-11.

Prior to giving this testimony, and as relevant to this petition, Jane Doe 4 initially refused to testify at trial:

> The day before her testimony, the trial court held a hearing under Evidence Code section 402 to determine whether she would agree to answers [sic] questions in the case. Jane Doe 4 was represented by her own attorney at the hearing. After being sworn as a witness, she refused to provide her date of birth in response to the prosecutor's question. At the prosecutor's request, the court ordered Jane Doe 4 to answer the lawyers' questions, stating that, unless she had a valid assertion of privilege, she was "required and ordered to answer the questions asked."

> Jane Doe 4 still refused to answer and declined to explain why she would not comply. Noting that Jane Doe 4 had been subpoenaed as a witness in the case, the court advised her as follows: "You, as every citizen or every person in this country, are required by law to testify unless you have a valid privilege that excuses you from testifying. You have an obligation to testify whether you want to or not. [¶] This is not an option on your part. It is an order from the Court. It is required by law, and it is a crime to refuse to testify. I'm ordering that you answer the questions asked. [¶] If you need to consult with your attorney, I'm happy to give you an opportunity to do that. But if you refuse to answer questions without a valid privilege you are committing a crime. The crime is contempt of court. And I will be proceeding down the path of enforcing a contempt of court through civil or criminal sanctions, if necessary. [¶] I have no interest in doing that. My interest is in requiring that you, like everyone else in this country, answer questions when ordered to do so, whether you want to or not. It is simply not an option on your part."

> Jane Doe 4 indicated that she understood, but still refused to testify. The court again admonished her: "[Jane Doe 4], you are ordered to testify. You do not have the option to refuse. If you continue to refuse to testify, I will cite you for contempt and schedule a criminal contempt trial for you. [¶] If you are found to have committed contempt, then you will have suffered a misdemeanor conviction for contempt in violation of Penal Code Section 166(a)(6). [¶] I will tell

United States District Court
Northern District of California

[you that] there are criminal sanctions that come along with this. They include probation, fines, community service. You can be ordered to take classes. [¶] You cannot be incarcerated for refusal to testify under the law, [footnote omitted] but it remains a crime, and it remains a fact that you do not have the option to refuse. So you are violating a court order if you refuse to testify."

After she again refused to answer basic questions, the prosecutor asked that Jane Doe 4 be held in contempt. The court ordered her to testify a third time and told her that, if she declined to do so, it would "cite [her] for contempt and hold a criminal contempt trial." She still refused. The court asked her attorney whether he had anything to add before it cited Jane Doe 4 for contempt, and counsel acknowledged that Code of Civil Procedure section 1219 did not create a privilege but only limited the sanctions available to the trial court. The court agreed, elaborating: "[Code of Civil Procedure Section] 1219 is a limitation on punishment. It is not a legal excuse for committing a crime. One can rob a bank, despite the punishment, it is still a crime."

The prosecutor then explained that, in addition to questions regarding Jane Doe 4's own reported sexual abuse by Gonzalez, she also intended to elicit testimony about the New Year's Eve incident involving Jane Doe 1 that Jane Doe 4 witnessed. The prosecutor argued that such testimony was unrelated to Jane Doe 4's status as a potential victim of sexual assault and thus her refusal to answer questions in that context would fall outside the ambit of Code of Civil Procedure section 1219, subdivision (b). The trial court found this argument "[i]nteresting" and stated it would give some thought to whether it would affect the sanctions it could impose on Jane Doe 4 "if she is convicted of criminal contempt." It allowed the prosecutor to question Jane Doe 4 specifically regarding New Year's Eve 2007, but she still refused to answer. The court concluded: "So, [Jane Doe 4], in light of your repeated refusal, despite many warnings and without any excuse or justification whatsoever, to comply with the court order, I am citing you with criminal contempt. [¶] I will hold a contempt trial tomorrow morning."

The next day, there was no discussion of a contempt trial. Instead, the district attorney made a proffer regarding Jane Doe 4's anticipated testimony, stating that Jane Doe 4 had entered therapy after she gave a statement to detectives in 2017. Apparently, she was now having doubts regarding whether the sexual abuse actually occurred. After argument, the court overruled renewed objections to Jane Doe 4's testimony based upon Evidence Code sections 1101, subdivision (b), 1108 and 352, and she testified as previously summarized.

*Id.* at 14-17.

### E. Testimony of A.M.

Even before she lived with them at the Hemleb house, A.M. spent a significant amount of time with Jane Does 1, 2, and 3 as their caretaker. A.M. acknowledged previously telling Detective

5

[Zachary] Bloom[2] that, on New Year's Eve 2007, Jane Doe 1 told her Gonzalez had pulled her into the bathroom and started touching her. A.M. later asked Gonzalez what had happened, and Gonzalez told her they were going to play hide-and-seek. A.M. told Detective Bloom that Gonzalez was yelling and stated: "'Everyone is lying and if anyone says anything, someone is going to get hurt.'" She had also reported to the detective that Gonzalez threatened to take their daughter and run away so A.M. would never see her again. A.M. did not make a report to the police. A.M. told Detective Bloom that one of the reasons they moved out of the Hemleb house for about a year in 2009 was that Jane Doe 1 told her Gonzalez was touching Jane Doe 2. A.M. did not go to the police.

In 2015, after A.M. and Gonzalez had returned to the Hemleb house, Jane Doe 1 told A.M. that Gonzalez was touching her again. A.M. asked Gonzalez about it, and he said it wasn't true. A.M. thought about moving out of the state at that time but took no steps to do so. A.M. told Detective Bloom that Gonzalez found a bag he had packed and threatened to take away her children if she reported the abuse. A.M. also told Detective Bloom that she never went to the police because she was frightened of Gonzalez.

When she met with Detective Bloom, A.M. was focused on getting her children back and believed she needed to tell him certain things and look cooperative. She was not really afraid of Gonzalez. Nor did she remember Jane Doe 1 telling her on New Year's Eve in 2007 that Gonzalez had touched her. Jane Doe 1 had reminded her of this fact prior to her interview. Jane Doe 1 telling her that their statements needed to line up had an effect on how A.M. explained things to the police. She never saw anything suspicious and, had she learned that something sexual was happening with the girls, she would not have hesitated to call the police.

### F. Police Testimony

. . .

Detective Bloom . . . interviewed Jane Doe 4 in March 2017. She was calm, appeared very cooperative, answered all of his questions without hesitation, and told him she had been molested by Gonzalez. Portions of her interview were played for the jury. Detective Bloom interviewed A.M. in April 2017. His testimony confirmed that A.M. had told him all the things she acknowledged reporting during her testimony.

*Id.* at 11-13.

After the introduction of evidence, the court instructed the jury on the reasonable doubt standard, and the parties discussed the standard in closing arguments:

In line with [California Penal Code] section 1096 and CALCRIM No.

---

[2] The Court of Appeal's decision refers to "Detective Bloom." This appears to be a misspelled reference to Detective Zachary Blume. *See* Ex. 1 at 128.

United States District Court
Northern District of California

220, the trial court instructed the jury in this case that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." In her closing argument, the prosecutor initially described her burden of proof as follows: "As you know, it's my burden to prove this case to you beyond a reasonable doubt. It's the highest burden in the criminal justice system. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction of the charge. So what does that mean? [¶] I find it easier to break it down. Abiding means lasting; conviction is the state of mind of being convinced. So if you are convinced that the defendant committed these charges and you don't see that feeling changing any time down the road, then I have proven the case to you beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is not proof beyond all possible doubt, because everything in life is open to some possible or imaginary doubt. There is doubt in everything."

Later in her closing, the prosecutor stated that the jury should view the "evidence as a whole," providing the following "analogy": "Imagine when you got – you were chosen as a juror, you were first sworn in, you sit down in your seats and you haven't heard any evidence, and there's a box in front of all of you. And the box is empty because you haven't heard any evidence. The defendant is not guilty at that point. He's presumed innocent. [¶] Once the trial starts, witnesses sit here and they start telling you things and giving you facts, and you're taking that evidence and you're putting it in the box. [¶] And at the end of the trial, you have a box full of evidence. And what do you do with it? The defendant wants you to pull out one piece of evidence, maybe (Jane Doe l)'s testimony, and hold it up and twist it around and look for all of the little problems with it and decide that you have a reasonable doubt as to what happened here. [¶] But that's not how you look at the evidence. You take out every piece from that box, and you look at it together as a whole. And you see what is reasonable when you're looking at all the evidence together. And you don't get to say, hey, there's something that's not in my box. I would really like to put some DNA in my box. I would really like to put a tape of the incident in the box. [¶] You may want those things, but you're not looking at what you don't have. You're looking at whether what you do have in your box convinces you beyond a reasonable doubt that the defendant is guilty."

In his closing argument, defense counsel discussed at length the prosecution's burden to prove the charges beyond a reasonable doubt – "the highest level of proof we have in the entire court system" – comparing it to lesser legal burdens and everyday decision making. He reiterated that it was the prosecutor's "obligation to prove the case beyond a reasonable doubt, not my obligation to prove innocence." "It's not: What do I think happened? It's not what does my gut tell me? It's not who do I believe more? It's: Did the government prove the case beyond a reasonable doubt? That's the only question for you to answer." "The burden of proof remains on [the prosecutor], and it remains that high, like we talked about, beyond a reasonable doubt."

The prosecutor responded in rebuttal: "What [defense counsel] just put up there, that's not reasonable doubt. Those are *reasons to doubt*.

That is not the same thing as having a reasonable doubt about the truth of a charge. My burden is to prove this case to you beyond a reasonable doubt. [¶] That's proof that leaves you with an abiding conviction in the truth of the charge." (Italics added.) Later, she elaborated: "This whole entire investigation, the trial, this is not something people would voluntarily bring upon themselves and their kids. If they did, they wouldn't take it this far. That is simply not reasonable. [¶] If you have a doubt, ladies and gentlemen, ask yourselves, *is that doubt reasonable in light of all of the evidence we've heard*? Is it reasonable that because there's no goggles found in the house from 2006 that the defendant is not guilty? No, that is not reasonable. [¶] Is it reasonable because we didn't have it from a teacher who sensed that one of the girls had been molested, that that means the defendant is not guilty? No. That is not reasonable. [¶] Is it reasonable to believe that three girls would go through all of this for no reason? It's not reasonable. [¶] The only reasonable conclusion is that this happened, and it's terrible that it happened. And we don't want to believe that things like this happened. But you've heard the evidence that it did, and that evidence that you've heard is enough evidence to prove the case beyond a reasonable doubt." (Italics added.)

[Petitioner later argued for a new trial on the ground that the prosecutor committed prejudicial misconduct in her closing argument by watering down the burden of proof.] In rejecting [this] . . . argument . . . , the trial court opined: "[The prosecutor] repeatedly, throughout her closing argument – and we all throughout the case, repeatedly from voir dire to closing argument – told the jury about a million times that the burden of proof is beyond a reasonable doubt. But in her argument, [the prosecutor] never strayed from that standard of proof and never suggested there was any other standard of proof. [¶] She did argue that the defense's theory was not reasonable in light of all the evidence and the People's case was more reasonable when you look at all the evidence. But that argument was expressly approved by the [California] Supreme Court in [*Centeno*] at page 673. [¶] Here, . . . unlike the prosecutor in [*Centeno*], [our prosecutor] did not conflate the idea of rejecting unreasonable inferences offered by the defense and suggest that rejecting those inferences would meet her burden of proof on every element. She clearly reminded the jury that she was required to prove every element beyond a reasonable doubt. And my view of the evidence of the case as a whole is that there is no danger, no possibility that the jury ever misunderstood that the People were required to prove their case beyond a reasonable doubt."

*Id.* at 33–36.

### G. Verdict and Sentencing

The case went to the jury with final instructions on March 26, 2019. On March 28, 2019, the jury returned guilty verdicts with respect to all 47 counts of felony child abuse. It also found the multiple victim enhancement true with respect to all but three counts for which it was alleged (counts 5, 6, and 19). On August 16, 2019, the trial court denied Gonzalez's motion for a new trial, rejecting three of the four claims he now raises on appeal.

8

> The trial court then moved on to sentencing. It denied probation and imposed a determinate sentence of 18 years, 8 months – the midterm of six years on each of counts 5, 6, and 19, and eight months (one third the midterm of two years) for count 34, all to run consecutively. The court additionally imposed a consecutive indeterminate sentence of 695 years to life – sentences of 25 years to life on counts 33, 42, and 45 through 47; and 15 years to life for counts 1 through 4, 7 through 18, 20 through 32, 35 through 41, 43, and 44. The court rejected Gonzalez's constitutional claim that the length of the sentence constituted cruel and unusual punishment. This timely appeal followed.

*Id.* at 13-14.

## II.    PROCEDURAL HISTORY

Following his conviction, Petitioner pursued a timely direct appeal. Ex. 11. On September 21, 2022, the California Court of Appeal rejected Petitioner's claims in a lengthy and well-reasoned opinion. Ex. 9. Petitioner appealed this decision to the California Supreme Court, which denied review on November 30, 2022. Ex. 13. Petitioner subsequently pursued state habeas relief, which was denied by the California Court of Appeal on September 21, 2022, and by the California Supreme Court on March 15, 2023. Exs. 10, 14. Petitioner's timely appeal to this Court followed on February 27, 2024, and he moved for an evidentiary hearing on April 14, 2025, seeking to examine trial counsel. ECF Nos. 1, 25.

## III.    LEGAL STANDARD

### A.    Federal Habeas Relief

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, "the federal court should 'look through' the unexplained decision to the last related state-

court decision that does provide a relevant rationale." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). In addition, the federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019).

The United States Supreme Court has made clear that § 2254(d)(1) consists of two distinct clauses. *Williams*, 529 U.S. at 412-13. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Id.* "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. It is important, however, that a federal court not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. The pertinent question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

For the purposes of both clauses, "clearly established Federal law" consists of Supreme Court holdings (excluding dicta) existing at the time of the relevant state court decision, because only the Supreme Court's holdings are binding on the state courts. *Id.* at 412. Circuit law may nevertheless be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

As apparent from the foregoing, AEDPA sets out a highly deferential standard for evaluating state court rulings: it requires a state prisoner "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Moreover, even if a petitioner

10

establishes a constitutional violation under the relevant standard, that is only the first hurdle the petitioner must clear.  Habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  *Davis v. Ayala*, 576 U.S. 257, 267 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict."  *Id.* at 267-68 (citation modified).

### B.    Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  "Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate."  *Id.*  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.*  "[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record."  *Id.* (citation modified).  "This principle accords with AEDPA's acknowledged purpose of reducing delays in the execution of state and federal criminal sentences."  *Id.* at 475 (citation modified).  Accordingly, district courts are not "required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings."  *Id.*

### IV.    DISCUSSION

Petitioner contends that the trial proceedings violated his rights in five ways:  (a) the trial court coerced Jane Doe 4 to testify in violation of his due process rights, Pet. at 32-40;[3] (b) the trial court improperly admitted Jane Doe 4's testimony under California Evidence Code section

---

[3] Petitioner's habeas petition includes a petition for writ of habeas corpus and a memorandum of points and authorities, each with separate pagination.  For consistency, the Court cites the PDF pages.

United States District Court
Northern District of California

1108 as an uncharged act of sexual abuse, *id.* at 44-46; (c) the prosecutor lowered the standard of proof during closing argument in violation of his due process rights, *id.* at 40-44; (d) defense counsel was ineffective by failing to object to these purported errors, in violation of the Sixth Amendment, *id.* at 46-49; and (e) Petitioner's sentence of 695 years to life violates his Eighth Amendment rights, *id.* at 49-52. Petitioner moves for an evidentiary hearing, seeking to develop facts pertaining to his ineffective assistance claim by examining his trial counsel. The Court addresses each argument for relief in turn.

### A.    Coerced Testimony

Petitioner contends that the trial court unlawfully coerced Jane Doe 4 to testify at the trial, in violation of his Fifth and Fourteenth Amendment rights, by threatening her with criminal contempt sanctions. Pet. at 32-40. In opposition, Respondent argues that the trial court's mistaken reference to criminal sanctions, as opposed to civil sanctions, did not violate Petitioner's right to a fair trial. Answer at 13-15. Respondent notes that Petitioner has not identified any applicable Supreme Court authority showing that the California Court of Appeal – the highest state court to issue a reasoned order on direct review – unreasonably violated clearly established federal law. *Id.*

### 1.    State Court Decision

On direct appeal, the California Court of Appeal held that the trial court's misstatement did not coerce Jane Doe 4's testimony or violate Petitioner's constitutional rights. The court reasoned:

> Although it is true that the [trial] court appeared to state, at times, that it would commence criminal contempt proceedings against Jane Doe 4, the error had little practical effect. The court could summarily find Jane Doe 4 in contempt and fine her up to $1000 under the civil contempt statutes. And it could also request that parallel criminal proceedings be instituted, which would allow, eventually, for a similar fine. The court continued the matter overnight to give Jane Doe 4 time to further consider her options and, had she still refused to testify, it could have held her in civil contempt and fined her without notice or a jury that next day. Thus, to the extent the court misspoke, we do not find the error particularly coercive, especially since Jane Doe 4 was represented by independent counsel throughout the proceedings. In the end, as the court recognized, it was Jane Doe 4's fear that she would lose her job for violating a court order that convinced her to testify, not anything specific to the possibility of a

12

criminal prosecution.[4]

. . .

[E]ven were we to conclude that Jane Doe 4 was somehow improperly coerced into testifying (which we do not), we would find no constitutional violation on this record because Gonzalez has made no showing that Jane Doe 4's testimony made his trial fundamentally unfair. This is not a case where a witness was coerced into testifying in a particular way or urged to be untruthful. Moreover, Jane Doe 4's trial testimony, in which she claimed to be unclear about whether the abuse actually occurred, was helpful to Gonzalez because it opened up the possibility that the jury would discount her prior statement to the police. Although Gonzalez no doubt would have preferred that Jane Doe 4 not testify at all and that no evidence of her sexual abuse allegations be admitted at trial, this desire does not implicate his constitutional fair trial rights. That testimony is damaging to the defense does not make it unconstitutional. In short, since Gonzalez has made no showing that Jane Doe 4's trial testimony was unreliable in a way which compromised his right to a fair trial, his constitutional complaint necessarily fails.

Ex. 9 at 23-24.

### 2.     Analysis of Federal Claim

Petitioner is not entitled to federal habeas relief for this claim because he has not shown that the California Court of Appeal's decision was contrary to, or involved an unreasonable application of, clearly established federal law. "Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (quoting 28 U.S.C. § 2254(d)). And the "[t]he Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process." *Id.*

Petitioner has not identified any Supreme Court authority establishing that the California Corut of Appeal's decision violated clearly established federal law. Petitioner's first argument is that the trial court violated his constitutional rights by coercing Jane Doe 4 to testify with the threat of criminal contempt sanctions. *See* Pet. at 33-39. The only Supreme Court authority

---

[4] Jane Doe 4 was specifically asked if there was any reason she chose to testify other than fear that she would lose her job if she violated the trial court's order. Ex. 1 at 471. She testified that there was not. *Id.*

United States District Court
Northern District of California

Petitioner cites in support of this argument is *Dickerson v. United States*, 530 U.S. 428, 435, 444 (2000), which held that *Miranda* is a constitutional rule and explained that *Miranda* was adopted because of the "coercion inherent in custodial interrogation" by police officers. *Dickerson* has no significance for Petitioner's claim. Requiring Jane Doe 4 to testify, pursuant to a lawful subpoena, bears little resemblance to a police interrogation. The Court therefore cannot conclude that *Dickerson* contains "materially indistinguishable facts" warranting habeas relief here. *Williams*, 529 U.S. at 413.

Petitioner's second argument is that, by asking the court to hold Jane Doe 4 in contempt, the prosecutor "asked that the court violate Jane Doe 4's due process and jury trial rights by subjecting her to an illegal summary misdemeanor court trial if [she] did not testify." Pet. at 39-40. As an initial matter, Petitioner does not explain how this alleged misconduct violated *his* constitutional rights, as opposed to those of Jane Doe 4. In any event, the three Supreme Court cases that Petitioner cites for support are materially distinguishable because each involved statements by a prosecutor to the jury, and two of the cases did not find that constitutional violations had occurred. *See Berger v. United States*, 295 U.S. 78, 84, 89 (1935) (holding that prejudice to the defendant was probable because of extensive misconduct by the prosecutor during cross-examination); *Darden v. Wainwright*, 477 U.S. 168, 181-83 (1986) (holding that the prosecutor's comments during closing argument did not render trial so fundamentally unfair as to deny defendant due process); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974) (same).

Petitioner cannot show actual prejudice either. *See Davis*, 576 U.S. at 267 (2015). Rather than confirm that Petitioner had molested her as a child, Jane Doe 4 testified at trial that she was "not sure" if Petitioner ever touched her inappropriately. Ex. 1 at 420; *see also id.* at 430-431 ("I am not confident at all."). She also testified that she had had never seen the other Jane Does act afraid of Petitioner or observed anything else like the New Year's Eve incident. *Id.* at 433-36. Nevertheless, Petitioner argues that Jane Doe 4's testimony was prejudicial because, if she had not testified, the prosecution could not have introduced her 2017 statement to the police. *See* Traverse at 7. But Jane Doe 4 had been lawfully subpoenaed to testify. Ex. 1 at 408. Thus, there was no lawful basis for preventing Jane Doe 4 from testifying, absent an applicable privilege which no

United States District Court
Northern District of California

party claims. In fact, had Petitioner's trial counsel objected to the specific contempt statute cited by the court – as Petitioner now urges should have occurred – the court would simply have cited the civil contempt statute, and the proceedings would have developed similarly since Jane Doe 4 did not have a lawful basis for refusing to testify. Accordingly, Jane Doe 4's 2017 statement that Petitioner had abused her was available as evidence whether the trial court cited the correct contempt statute or not.

Because Petitioner has not shown that the trial court violated clearly established federal law or that he suffered actual prejudice as a result of the trial court's mistaken reference to criminal contempt sanctions, the California Court of Appeal's decision to reject this claim was reasonable and is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d). This claim is therefore DENIED.

### B. Admissibility of Jane Doe 4's Statements

Petitioner advances a second argument for why Jane Doe 4's testimony concerning her childhood abuse was improperly admitted at trial: according to Petitioner, because the statute of limitations had run on prosecuting Jane Doe 4's alleged abuse, it is not a "sexual offense" for purposes of California Evidence Code section 1108(a) and therefore inadmissible under that statute. Pet. at 44-46. Respondent argues that habeas relief is not available for errors of state evidentiary law and that Petitioner has not identified any applicable Supreme Court authority. Answer at 22-23.

#### 1. State Court Decision

In a lengthy analysis, the California Court of Appeal concluded that, contrary to Petitioner's argument, "the term 'sexual offense' in [California Evidence Code section 1108(a)] was intended to apply broadly to any proscribed sexual conduct committed by a defendant, regardless of whether the statute of limitations for that conduct has expired." Ex. 9 at 32. The court reached this decision based on the fact that the statute does not include a temporal limitation or distinguish between charged and uncharged sexual offenses. *Id.* at 28-32. The court reasoned that it would be anomalous for a charged offense to be admissible evidence when the same conduct, if uncharged and the statute of limitations had run, would not be admissible. *Id.* at 31-32.

15

Additionally, the court emphasized that the statute of limitations only limits a perpetrator's exposure to criminal prosecution, whereas section 1108 governs the admissibility of evidence of certain prior acts at trial, which is not being used to prosecute the individual directly. *Id.* at 29-30. The court therefore rejected Petitioner's proposed construction of section 1108(a) and concluded that the trial court correctly admitted Jane Doe 4's testimony.

### 2. Analysis of Federal Claim

The Supreme Court has made clear that "federal habeas corpus relief does not lie for errors of state law." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citation modified). Yet, Petitioner's only argument is that the California Court of Appeals misinterpreted the California Evidence Code. *See* Pet. at 44-46; *see also* Traverse at 15. That is not a basis for federal habeas relief. Nor has Petitioner identified any applicable Supreme Court authority or even identified what constitutional right was purportedly violated by this supposed error. The only Supreme Court case that Petitioner cites established the statute of limitations for prosecuting sex crimes, but it said nothing about section 1108(a) or whether uncharged sexual misconduct could be introduced as evidence at trial. Pet. at 45-46 (citing *Stogner v. California*, 539 U.S. 607 (2003)). Because Petitioner has not identified any basis for federal habeas relief on this claim, the California Court of Appeal's decision is reasonable and entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d). This claim therefore is DENIED.

### C. Reasonable Doubt Standard

Next, Petitioner argues that the prosecutor violated his due process rights by misstating the reasonable doubt standard during closing arguments. Pet. at 40-44. Petitioner's argument relies almost exclusively on *People v. Centeno*, 60 Cal. 4th 659 (2014), a California Supreme Court case. Respondent argues that the California Court of Appeal's decision was not an objectively unreasonable application of clearly established *federal* law, and that *Centeno* is distinguishable regardless. Answer at 16-22.

### 1. State Court Decision

On direct appeal, the California Court of Appeal held that the prosecutor did not misstate the reasonable doubt standard during closing argument:

United States District Court
Northern District of California

First, we see no error in the prosecutor's elaboration on what constitutes an "abiding conviction" for purposes of the reasonable doubt standard of proof. In stating that abiding means "lasting" and conviction means being "convinced," so that an abiding conviction means "you are convinced that the defendant committed these charges and you don't see that feeling changing any time down the road," the prosecutor was merely suggesting well-established alternate definitions for the words.

. . .

Nor do we find error in the prosecutor's box analogy. The prosecutor was simply making the point that the jury should look at all of the evidence as a whole, even if there is other evidence it might have liked to have been presented: "You're looking at whether what you do have in your box convinces you beyond a reasonable doubt that the defendant is guilty." This is a correct statement of the law.

. . .

We also reject Gonzalez's final misconduct claim – that the prosecutor improperly suggested she could meet her burden of proving the charges beyond a reasonable doubt if her theory of the case was "reasonable." In making the challenged statements in her rebuttal argument, the prosecutor was stressing that the flaws in the evidence pointed out by defense counsel in his closing did not create reasonable doubt because they were simply "reasons to doubt" that were not reasonable. The prosecutor stated: "If you have a doubt, ladies and gentlemen, ask yourselves, is *that doubt reasonable in light of all of the evidence we've heard*?" (Italics added.) She listed a number of suggested defense inferences supporting Gonzalez's claimed innocence – that the victims were lying, that no goggles were found, that there were no reports of molest from teachers – and stated they were not reasonable inferences and thus did not support a finding of reasonable doubt. The prosecutor then concluded that the "only reasonable conclusion" is "that this happened" and argued to the jury: "[Y]ou've heard the evidence that it did, and the evidence that you've heard is enough evidence to prove the case beyond a reasonable doubt."

Unlike the prosecutor in *Centeno*, the prosecutor here was not improperly conflating the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt. Rather, she was arguing that the jury should reject the unreasonable interpretations of the evidence suggested by the defense and accept the only reasonable interpretation left – that Gonzalez was guilty beyond a reasonable doubt. This did not constitute misconduct. (*See Centeno*, *supra*, 60 Cal.4th at p. 672 [approving argument that "the jury must 'decide what is reasonable to believe versus unreasonable to believe" and to '"accept the reasonable and reject the unreasonable"' because '[n]othing in [that] explanation lessened the prosecutions [sic] burden of proof"]; *People v. Jasmin* (2008) 167 Cal.App.4th 98, 114-116 [finding "not objectionable" comments that . . . "there is but one reasonable choice to make" and urging jury to apply its "reason" to the facts and not do the "unreasonable thing"].) [footnote omitted]. Certainly, given the repeated references to the

17

reasonable doubt standard by both parties and the court, we see no "'reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*Pierce*, *supra*, 172 Cal.App.4th at p. 572.) [footnote omitted].

Ex. 9 at 38-41.

### 2.      Analysis of Federal Claim

It is clearly established federal law that a prosecutor's improper comments during closing argument may violate a defendant's right to due process if the argument "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).  The Court must distinguish "between ordinary trial error of a prosecutor and that sort of egregious misconduct . . . amount[ing] to a denial of constitutional due process." *Donnelly*, 416 U.S. at 647-48.  "[B]ecause the *Darden* standard is a very general one," state courts have "more leeway" in its application.  *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (per curiam) (citation modified); *see also Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (AEDPA "recognizes . . . that even a general standard may be applied in an unreasonable manner").

The California Court of Appeal did not unreasonably apply the *Darden* standard.  It is undisputed that the trial court properly instructed the jury on the standard for reasonable doubt. *See* Ex. 1 at 169; *see also* Pet. at 44 (not challenging the court's instruction, but arguing that the prosecutor erred by not following the instruction).  The court also told the jury to follow the law as it explained it, including if any attorney's comments conflicted with the court's instructions.  Ex. 1 at 164.  "A jury is presumed to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Thus, even if the prosecutor had misstated the reasonable doubt standard, she would not have "so infected the trial with unfairness" as to amount to a denial of due process since the jury was properly instructed.  *Darden*, 477 U.S. at 181-83 (citation modified) (finding that the prosecutor's closing argument did not deprive petitioner of a fair trial because the court properly instructed the jury).

In any event, the Court agrees with the California Court of Appeal that the prosecutor's comments were not improper, particularly given that she repeatedly told the jury that her burden

United States District Court
Northern District of California

was to prove Petitioner's guilt beyond a reasonable doubt. *See, e.g.*, Ex. 1 at 515 ("As you know, it's my burden to prove this case to you beyond a reasonable doubt."), 600 ("My burden is to prove this case to you beyond a reasonable doubt."). Certainly, the prosecutor's remarks were not more prejudicial than a prosecutor's misstatement during closing argument that the presumption of innocence was "over," which the Ninth Circuit – applying *Darden* – found was insufficient for habeas relief. *Ford v. Peery*, 999 F.3d 1214, 1224, 1227 (9th Cir. 2021). Thus, the prosecutor's closing argument did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (citation modified).

Petitioner's other citations do not alter this analysis. As an initial matter, Petitioner's reliance on *Centeno* is misplaced because it is a California Supreme Court case which is not authoritative for federal habeas. Meanwhile, the four Supreme Court cases that Petitioner cites are not on point. Three of the cases – *Cage v. Louisiana*, 498 U.S. 39, 40-41 (1990) (per curiam); *Victor v. Nebraska*, 511 U.S. 1, 7 (1994); and *Delo v. Lashley*, 507 U.S. 272, 278-80 (1993) – concerned issues with the jury instructions, not statements to the jury during closing argument.[5] And the fourth case, *Herrera v. Collins*, has no relation of any kind to the reasonable doubt standard or statements made during closing argument. *See* 506 U.S. 390, 399 (1993) (holding that a claim of actual innocence based on newly discovered evidence is not grounds for federal habeas relief). Thus, because the prosecutor's closing argument did not render the entire trial unfair, the California Court of Appeal's decision is entitled to AEDPA deference. *See* 28 U.S.C. § 2254(d). The claim therefore is DENIED.

### D. Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective by failing to object to the alleged misconduct in the foregoing claims. Pet. at 46-49. Petitioner separately moved for an evidentiary hearing "on all issues of ineffectiveness of trial counsel so that trial counsel can be questioned about his reasons, if any, for his complained of acts and omissions." Mot. at 6. In opposition, Respondent argues that because the California Court of Appeal found Petitioner's underlying

---

[5] Petitioner also cites a Ninth Circuit case, *Deck v. Jenkins*, which is distinguishable on the same basis. *See* 814 F.3d 954, 980 (9th Cir. 2016) ("[T]he jury was never correctly instructed").

claims to be unfounded, trial counsel was not ineffective because any objection would have been futile.  Answer at 23-25.

### 1.    State Court Decision

On direct appeal, the Court of Appeal rejected Petitioner's ineffective assistance claim, reasoning that:

> Because we have rejected both Gonzalez's constitutional claim based on third-party coercion as well as his proposed construction of Evidence Code section 1108, we also reject his concomitant assertions that his trial counsel was ineffective for failing to object to the admission of Jane Doe 4's testimony on these bases.
>
> . . .
>
> [And] [b]ecause we have rejected Gonzalez's claims of prosecutorial error, we again find no ineffective assistance of counsel.

Ex. 9 at 32 n. 8, 41 n. 10.

### 2.    Analysis of Federal Claim

Petitioner has not stated a claim for habeas relief under the Sixth Amendment for ineffective assistance of counsel.  To prevail on a claim of ineffective assistance, a petitioner must establish that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness" as measured by "prevailing professional norms."  *Id.* at 688.  "[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."  *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).  "'Judicial scrutiny of counsel's performance must be highly deferential,' and courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *West v. Ryan*, 608 F.3d 477, 486 (9th Cir. 2010) (quoting *Strickland*, 466 U.S. at 689).  To prove prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  "When a defendant challenges a conviction, the

20

question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (citation modified).

"Surmounting *Strickland*'s high bar is never an easy task." *Harrington*, 562 U.S. at 105 (citation modified). "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Id.* "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* (citation modified). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Here, Petitioner argues that counsel was ineffective by failing to object (1) when the court compelled Jane Doe 4 to testify, (2) when the court admitted Jane Doe 4's testimony concerning her own childhood abuse, and (3) when the prosecutor discussed her burden during closing argument. Pet. at 46-49. None of these allegations present a colorable claim of ineffective assistance.

Under *Strickland*'s first prong, trial counsel's performance with respect to at least the second and third arguments was not deficient. An attorney's failure to take a futile action does not constitute ineffective assistance of counsel. *See James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994). Here, the California Court of Appeal determined that Jane Doe 4's testimony was properly admitted under section 1108(a), and this Court must "accept [its] interpretation of California law." *Deck*, 814 F.3d at 979. Thus, there is no basis for arguing that trial counsel erred since any objection would have been meritless as a matter of law. And the Court agrees that the prosecutor did not misstate the reasonable doubt standard, so any objection would again have been futile.

Meanwhile, the Court need not decide whether trial counsel was deficient by failing to object when the trial court referred to the incorrect contempt statute because, under *Strickland*'s second prong, that failure did not prejudice Petitioner. As explained above, Jane Doe 4 would have been in violation of a court order by refusing to testify regardless of which contempt statute

21

was cited.  The sole reason she chose to testify – to avoid violating a court order and its implication for her work – would have remain unchanged.  Ex. 1 at 471.  Accordingly, Petitioner has not shown that there is a reasonable probability that the result of the proceeding would have been different.[6]  The claim is therefore DENIED because the California Court of Appeal's decision on this claim is reasonable and entitled to AEDPA deference.  *See* 28 U.S.C. § 2254(d).

### 3.    Motion for Evidentiary Hearing

Petitioner's motion for an evidentiary hearing is based solely on his ineffective assistance claim.  Petitioner argues that the Court should hold an evidentiary hearing because, "[w]here [a] petitioner has presented a colorable claim of ineffective assistance of counsel, issues such as whether counsel's acts and omissions represented strategic decisions reached after thorough investigation of law and facts relevant to plausible options cannot ordinarily be determined without a factual hearing."  Mot. at 6 (citation modified).  However, Petitioner has *not* presented a colorable claim of ineffective assistance.  Without a colorable claim of ineffective assistance, the Court need not hold an evidentiary hearing because "the record . . . precludes habeas relief."  *Schriro*, 550 U.S. at 474.  Thus, Petitioner's motion for an evidentiary hearing is DENIED.[7]

### E.    Length of Sentence

Petitioner's final argument for habeas relief is that "[a]n effective life without parole sentence for non-murder convictions against three victims is disproportionate under the Eighth Amendment" because, if Petitioner had "committed first degree murder against all three of the Jane Does, the most he could have been charged with is . . . life without possibility of parole" now that "Governor Gavin Newsom ordered a moratorium on all executions."  Pet. at 50-51.

---

[6] Additionally, Petitioner has not identified any applicable Supreme Court authority showing that the Court of Appeal violated clearly established federal law by denying his ineffective assistance claim.  *See* Pet. at 46-49 (citing *Strickland*, 466 U.S. at 687-88, 700 (holding that counsel was *not* ineffective) and *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (holding that counsel was ineffective by failing to file a timely suppression motion)).

[7] Additionally, Petitioner's motion does not comply with the Habeas Corpus Local Rules, which require that requests for an evidentiary hearing "include a specification of which factual issues require a hearing *and a summary of what evidence the party proposes to offer*."  Habeas L.R. 2254-7(a) (emphasis added).  Petitioner has not identified what evidence he proposes to offer, beyond generic references to the need to ask trial counsel for "his reasons, if any," for not objecting to Jane Doe 4's testimony and the prosecutor's closing argument.  Mot. at 6.

22

United States District Court
Northern District of California

Respondent argues that Petitioner's sentence is proportional to the crimes he was found guilty of committing. Answer at 26-29.

### 1. State Court Decision

On direct appeal, the California Court of Appeal disagreed that Petitioner's sentence was disproportionate under the Eighth Amendment:

> The sentence in this case is no doubt severe. On the other side of the scale, however, the sheer number of Gonzalez's multiple sex offenses, committed over more than a decade against three very vulnerable victims, all of whom testified they were under the age of 5 when the abuse started, weigh heavily against him. In addition, Jane Doe 1 testified that the incidents which formed the basis for the charges were "just a very small portion" of the totality of what occurred over the years. Further, Gonzalez made threats, including threats of physical harm, when faced with discovery, and, as the trial court expressly found, the manner in which Gonzalez committed the numerous offenses evinced a high degree of cruelty and callousness. The court concluded he was a serious danger to society. Consideration of all of these circumstances does not lead us to an "'inference of gross disproportionality'." . . . Consequently, Gonzalez's Eighth Amendment claim fails at the outset, and we need not conduct a comparative analysis.

Ex. 9 at 45-46 (citation omitted).

### 2. Analysis of Federal Claim

Under Eighth Amendment jurisprudence, "one governing legal principle emerges as 'clearly stablished' under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." *Lockyer*, 538 U.S. at 72. However, the "precise contours of [the gross disproportionality principle] are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." *Id.* at 73 (citation omitted).

This is not one of those exceedingly rare cases. Put bluntly, it is not clearly established under federal law that a sex felon, convicted of raping his three nieces when they were minors, cannot be sentenced to life in prison because he would have received the same sentence had he murdered his nieces instead. Petitioner attempts to show otherwise by gesturing toward four Supreme Court cases: *Lockyer*, 538 U.S. at 72; *Ewing v. California*, 538 U.S. 11 (2003); *Harmelin v. Michigan*, 501 U.S. 957 (1991); and *Roper v. Simmons*, 543 U.S. 551 (2005). *See* Pet. at 50. But these cases are not remotely on point. In *Lockyer*, *Ewing*, and *Harmelin*, the

Supreme Court found that the imposed sentences were *not* grossly disproportionate to the severity of the crimes, which were nonviolent or petty theft crimes. *Lockyer*, 538 U.S. at 66, 68, 77 (upholding defendant's sentence of two consecutive terms of twenty-five years to life in prison for stealing approximately $150 in videotapes, under California's three strikes law, because "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case"); *Ewing*, 538 U.S. at 18-19, 28-31 (finding that defendant's sentence of twenty-five years to life under California's three strikes law was not grossly disproportionate when he was convicted for stealing three golf clubs worth $399); *Harmelin*, 501 U.S. at 994-95 (affirming defendant's life sentence without parole when he was convicted of possessing 672 grams of cocaine and had no prior felony convictions). Thus, Petitioner's own citations confirm that life sentences are appropriate under the Eighth Amendment for a range of crimes other than murder. Meanwhile, the issue in *Roper* was whether an individual who was a minor when they committed a capital offense could be sentenced to death, which is entirely inapposite. *See* 543 U.S. at 575.

Thus, the California Court of Appeal's determination that Petitioner's sentence was not grossly disproportionate because of Petitioner's sex offenses, committed against three vulnerable victims, was neither contrary to nor an unreasonable application of clearly established federal law. The decision is entitled to AEDPA deference the claim is therefore DENIED. *See* 28 U.S.C. § 2254(d).

## V.    CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

473, 484 (2000).  Here, Petitioner has made no showing warranting a certificate of appealability and a certificate is therefore DENIED.[8]

## VI.    ORDER

For the foregoing reasons, Petitioner's petition for a writ of habeas corpus (ECF No. 1) is DENIED.  A certificate of appealability is DENIED.  Petitioner's motion for an evidentiary hearing (ECF No. 25) is also DENIED.  The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated: March 30, 2026

Eumi K. Lee
United States District Judge

---

[8] Petitioner may not appeal the denial of a certificate of appealability in this Court, but he may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

25